Mr. James A. Buttry, Attorney at Law Friday, Eldredge Clark 2000 Regions Center 400 West Capitol Avenue Little Rock, AR 72201-3493
Dear Mr. Buttry:
You have requested approval, pursuant to the Interlocal Cooperation Act, A.C.A. § 25-20-101 et seq., of a proposed interlocal agreement between the Stilwell Area Development Authority, Stilwell, Oklahoma (the "Authority") and Independence County, Arkansas, pursuant to which the Authority would agree to buy electricity produced at various yet-to-be constructed facilities owned by the county. You indicate in your request that you are seeking approval of this proposed agreement pursuant to A.C.A. § 25-20-104(f), which provides that I must approve any interlocal agreement to undertake a joint enterprise between or among "public agencies." A.C.A. § 25-20-104.
As an initial matter, I must determine whether both parties to the proposed agreement indeed qualify as "public agencies" — a term the Arkansas Code defines in pertinent part as follows:
 "Public agency" means . . . any political subdivision of this state . . . [and] any political subdivision of another state. . . .
It is beyond any dispute that Independence County, Arkansas, like any county, is a "political subdivision" of the state. Dermott Special SchoolDist. v. Johnson, 343 Ark. 90, 95, 32 S.W.3d 477 (2000). However, it is less apparent that the Authority, which is an entity distinct from the City of Stilwell, would qualify as a "political subdivision." The legislature has defined the term in various ways, depending on the context of particular legislation. See, e.g., A.C.A. § 8-5-301
("`Political subdivision' means any city of the first class, city of the second class, incorporated town, county, improvement district, or other political subdivision of the State of Arkansas, or any combination of them."); A.C.A. §§ 12-9-102(3) and 12-9-401(4) ("`Political subdivision' means any county, municipality, township, or other specific local unit of general government."); A.C.A. § 12-50-103(8) ("`Political subdivision' means a city of any class, a town, or a county."); (14-77-102(3) ("`Political subdivision' means any county, municipality, or school district of the State of Arkansas."); A.C.A. § 15-6-103(8) ("`Political subdivision' means a county, municipality, and any other unit of local government, including a school district and an improvement district, authorized by law to perform governmental functions."); A.C.A. §19-7-901(2) ("`Political subdivision' means any agency or unit of this state which is authorized to levy taxes or empowered to cause taxes to be levied."). In two instances, the term has been defined as including only public corporations: A.C.A. § 21-1-303(5) ("`Political subdivision' includes counties, cities, towns, villages, townships, districts, authorities, and other public corporations and entities whether organized and existing under charter or general law."); and A.C.A. § 15-5-103(15) ("`Political subdivision' means a city of the first class, a city of the second class, an incorporated town, a county, or an improvement district, or any agency, board, commission, public corporation, or instrumentality of the above.").
Although it is difficult to glean any bright-line rules from these various statutory definitions — other, perhaps, than that "authorities" are not per se excluded from the designation — the Arkansas Supreme Court has adopted the following general definition of the term "political subdivision":
 [P]olitical subdivisions have been defined as that they embrace a certain territory and its inhabitants, organized for the public advantage, and not in the interest of particular individuals or classes; that their chief design is the exercise of governmental functions; and that to the electors residing within each is, to some extent, committed the power of local government, to be wielded either mediately or immediately within their territory for the peculiar benefit of the people there residing.
Dermott Special School District v. Johnson, 343 Ark. 90, 95,32 S.W.3d 477 (2000), quoting Muse v. Prescott School Dist., 233 Ark. 789,791, 349 S.W.2d 329 (1961), in turn quoting Arkansas Highway Commission v. Clayton,226 Ark. 712, 715, 292 S.W.2d 77 (1956) in turn quoting Allisonv. Corker, 67 N.J.L. 596, 52 A. 362 (1902).
In Ark. Op. Att'y Gen. No. 2001-363, I concluded that a housing authority would in all likelihood fall within the just recited definition of "political subdivision." Although the issue is ultimately one of fact, turning in part on the actual organizational structure of the Authority, I believe as a general proposition that a development authority would qualify as a "political subdivision." As reflected in the following from Ark. Op. Att'y Gen. No. 99-277, various "authorities," including a "development authority," have been designated "public bodies," and hence "units of government," under Arkansas law:
 The term "public body" has been consistently applied in the Code to entities that appear clearly to qualify as "units of government." For instance, A.C.A. § 17-33-101 defines the term as "any agency of the State of Arkansas or any political subdivision of the state." Similarly, A.C.A. § 22-9-302 defines the term as "the State of Arkansas or any officer, board, or commission of the state, any county, city, municipality or other political subdivision, or any of the agencies thereof." A.C.A. § 14-188-103 defines the term "state public body" as meaning "any city, town, county, municipal corporation, commission, district, authority, or other political subdivision of this state." A.C.A. § 14-169-203 defines the phrase" state public body" as meaning "any city, town, county, municipal corporation, commission, district, authority, other subdivision, or other public body of the state."
 In accordance with such definitions, the Code has expressly identified as "public bodies" such entities as a housing authority, A.C.A. § 14-169-211, a rural development authority, A.C.A. § 14-188-109, the Arkansas Development Finance Authority, A.C.A. § 15-5-201, and the State Highway Commission, A.C.A. § 23-12-304. These organizations all might be considered "units of government" insofar as they not only implement but make public policy.
I am further struck by the liberality of the legislature's statement of purpose in the Interlocal Cooperation Act:
 It is the purpose of this chapter to permit local governmental units to make the most efficient use of their powers by enabling them to cooperate with other localities on a basis of mutual advantage and thereby to provide services and facilities in a manner and pursuant to forms of governmental organization that will accord best with geographic, economic, population, and other factors influencing the needs and development of local communities.
In my opinion, this statute reflects an intention to expedite precisely the sort of agreement at issue in your request, whereby a county would provide power to a municipal authority in order to serve city residents. My inquiries reveal that the Authority is organized pursuant to Okla. Stat. Ann. § 60-4-176.1 as a "public trust" that exists for the "public benefit" and whose "function or enterprise . . . is or could be authorized by state law to be performed by the beneficiary" — i.e., by the City of Stilwell itself. Pursuant to duplicative amendments enacted in 2002, Okla. S.B. 1527 and Okla. H.B. 2056, such public beneficiary trusts are expressly granted the power of eminent domain. As these statutory provisions suggest, the Authority's purpose is the performance of an essentially governmental power, see A.C.A. § 14-54-701 (authorizing municipal corporations to provide power to their residents), thus qualifying the Authority to enter into an interlocal agreement under Arkansas law. Compare Ark. Op. Att'y Gen. No. 2000-187 (opining that the Central Arkansas Transit Authority might properly enter into an interlocal agreement with the City of Little Rock and the City of North Little Rock to renovate, operate and maintain the Main Street Bridge across the Arkansas River).
Having opined that the parties are duly situated to enter into an interlocal agreement, I must next determine whether the proposed agreement in fact involves a joint undertaking of the sort that requires my approval, as opposed to a straightforward purchase contract of the sort the parties might enter into without my approval. See A.C.A. §25-20-108. The agreement would essentially commit the Authority to buy electricity from the county's planned facilities at specified rates from the time of the facilities' completion until January 31, 2036. It provides that the Authority's payments will initially accrue in a reserve fund, the corpus of which is to be used for debt service depreciation, the payment of operating expenses and the discharge of various costs incurred in periodically relicensing the facility. The proposed agreement further provides that once the reserve fund attains assets of $10 million, the Authority's annual contribution will be refunded and it will additionally be entitled to recover a specified portion of the fund's annual earnings. The Authority would further agree to cooperate with the county in seeking FERC license renewals. Finally, the Authority would be empowered to select one of the four members of an Operating Committee charged with managing the power facilities and investing reserve fund assets.
I believe the arrangement described in the preceding paragraph qualifies as a joint enterprise, as opposed to a simple sales contract. Insofar as the Authority would have obligations beyond merely buying electricity and might realize revenues from reserve fund earnings, the agreement has features that resemble those of a joint venture or partnership. Accordingly, I agree that the proposed agreement is subject to my approval pursuant to A.C.A. § 25-20-104(f).
The Interlocal Cooperation Act requires that interlocal agreements for joint or cooperative action specify the following items:
(1) The duration of the agreement;
(2) The purposes of the agreement;
 (3) The manner of financing the joint or cooperative undertaking and of establishing and maintaining a budget for it;
 (4) The methods of accomplishing termination of the agreement and for the disposal of property, if any, upon termination;
(5) Any other necessary and proper matters.
A.C.A. § 25-20-104(c).
In addition, if the interlocal agreement does not establish a separate legal entity to conduct the joint or cooperative undertaking, it must specify the following items:
 (1) The provision for an administrator or a joint board that will be responsible for administering the joint or cooperative undertaking;
 (2) The manner of acquiring, holding, and disposing of real and personal property, if any, used in the joint or cooperative undertaking.
A.C.A. § 25-20-104(d).
Having reviewed the proposed agreement, I conclude that it meets all of the requirements set forth above. Accordingly, I hereby approve the agreement as submitted.
Finally, I should note that in approving the proposed agreement, I am taking no position on the following issues: (1) whether the county is properly licensed by the Federal Energy Regulatory Commission ("FERC") to operate the facilities; and (2) whether the proposed agreement complies with the FERC license and/or federal or state law regulating the sale of electricity.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:JD/cyh